**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
_____

**HEARTLAND TRADEMARKS, LTD.,**

                        **Plaintiff,**

    vs.                                       **5:17-CV-795
(MAD/ATB)**

**DR FLAX LLC,**

                        **Defendant.**
_____

**APPEARANCES:**                                 **OF COUNSEL:**

**HARRIS, BEACH LAW FIRM**             **NEAL LOUIS SLIFKIN, ESQ.**
99 Garnsey Road
Pittsford, New York 14534
Attorneys for Plaintiff

**HARRIS, BEACH LAW FIRM**              **TED H. WILLIAMS, ESQ.**
333 West Washington Street - Suite 200
Syracuse, New York 13202
Attorneys for Plaintiff

**HARRIS, BEACH LAW FIRM**              **TRISTAN D. HUJER, ESQ.**
726 Exchange Street - Suite 1000
Buffalo, New York 14210
Attorneys for Plaintiff

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

    On July 20, 2017, Plaintiff Heartland Trademarks, Ltd., commenced this action against Defendant Dr. Flax LLC alleging trademark infringement, unfair competition, and deceptive business practices. *See* Dkt. No. 1. Presently before the Court is Plaintiff's motion for a temporary restraining order, which was filed on July 24, 2017. *See* Dkt. No. 8. Plaintiff's motion

seeks injunctive relief relating to alleged trademark infringement. *See id.* at 2. For the following reasons, Plaintiff's motion is granted.

## II. BACKGROUND

Plaintiff is the sole owner of the trademark, "FLAX," for use in connection with dresses skirts pants, jackets, shirts, coats, and shoes ("FLAX Goods"). *See* Dkt. No. 1 at ¶ 2. FLAX Goods are made of linen—linen is manufactured from the flax plant, which is the source of the FLAX name. *See* Dkt. No. 8-4 at ¶ 6. Clothing and apparel under the FLAX name have been marketed and sold since 1992. *See id.* at ¶ 5. The FLAX trademark was registered with United States Patent and Trademark Office ("PTO") on August 13, 1996, *see* Dkt. No. 1-1 at 2-3, and it was assigned to Plaintiff on September 17, 2001, *see* Dkt. No. 1-2 at 2-4.

Plaintiff has permanent showrooms in New York, Los Angeles, Dallas, Chicago, and Atlanta, where it exhibits FLAX Goods; it also exhibits FLAX Goods at fourteen national and regional trade shows. *See* Dkt. No. 8-4 at ¶ 12. In total, "the workforce supporting the FLAX Mark and the FLAX Goods [includes] as many as 75 people." *Id.* at ¶ 13. Additionally, Plaintiff has invested approximately $3 to $4 million per year "in the goodwill of the FLAX Mark," including more than $1 million each year in marketing costs. *Id.* at ¶ 14. Plaintiff's investment in the FLAX brand has paid off—sales of FLAX Goods average $20 million per year, and enthusiastic FLAX consumers created "an internet fan page and chat site devoted to discussing the FLAX Goods," which was called "flaxista." *Id.* at ¶¶ 16-17.[1] FLAX Goods are sold on the FLAX website and through six online retailers, but they are primarily sold in retail stores. *See id.*

---

[1] Plaintiff does not provide a link to the "flaxista" website, and it is not clear that the page still exists.

at ¶ 20. Plaintiff has sold FLAX Goods in forty-nine states, as well as in the Caribbean, Europe, and Asia. *See id.*

In 2014, Plaintiff granted an exclusive license of the FLAX mark and FLAX Goods to a third party licensee. *See id.* at ¶ 18. While the licensee is currently responsible for the sale and promotion of FLAX Goods, Plaintiff still owns the FLAX mark and receives royalties on the sale of FLAX Goods. *See id.* Pursuant to the licensing agreement, the licensee has the option to purchase the FLAX mark, and Plaintiff claims that the licensee "is expected to exercise its option to purchase the FLAX Mark at the end of the term." Dkt. No. 8-1 at 18.

In late June 2017, Plaintiff was informed that Defendant was selling goods that infringed on the FLAX mark. *See* Dkt. No. 8-4 at ¶ 28. Specifically, Defendant sells linen clothes of a similar style to the FLAX Goods, and it sells them under varying names, including Dr Flax, Dr. Flax, Doctor Flax, DoctorFlax, dr.flax, and @dr.flax. *See id.* at ¶ 23. Defendant formed a limited liability company on October 15, 2015, and began promoting its products on Instagram on January 20, 2017. *See id.* at ¶¶ 27-28. Plaintiff first discovered Defendant's products on the Facebook page of a boutique clothing store that also sells FLAX Goods. *See id.* at ¶ 28. On June 30, 2017, Plaintiff sent Defendant a cease and desist letter demanding that Defendant stop using the word "flax" in connection with the sale of its clothing. *See* Dkt. No. 1-3 at 2. On July 13, 2017, Defendant responded by refusing to comply with Plaintiff's demand. *See* Dkt. No. 8-4 at ¶ 30.

Plaintiff sells the vast majority of its goods to retailers at national and regional trade shows. *See id.* at ¶ 34. Many of the significant trade shows for spring and summer clothing—the type of clothing sold by both parties—take place throughout the month of August. *See id.* at ¶ 35. Therefore, Plaintiff claims that its sales and its agreement with the licensee will be in jeopardy if

Defendant is not prevented from participating in the August trade shows. *See id.* at ¶ 33.
According to Plaintiff, at least one sales director of a regional trade show has already confused the FLAX and Dr. Flax brands. *See id.* at ¶ 32. The sales director for the Dallas regional trade show stated that she believed Dr. Flax was a subsidiary of the FLAX brand. *See id.* at ¶ 28.

On July 24, 2017, Plaintiff filed an emergency motion for a temporary restraining order seeking to enjoin Defendant from marketing and selling clothing under labels that infringe on the FLAX mark. *See* Dkt. No. 8-1 at 1. The following day, the Court issued an order asking Defendant to show cause why a temporary restraining order should not be granted. *See* Dkt. No. 9. Plaintiff's counsel served a copy of the motion for a temporary restraining order and the Court's order to show cause on Defendant's counsel and attempted to complete service on Defendant, but service was refused. *See* Dkt. Nos. 11, 11-1, 11-2.

### III. STANDARD OF REVIEW

"Temporary restraining orders . . . and preliminary injunctions are extraordinary and drastic remedies." *Lawrence v. Zee*, No. 16-CV-1515, 2016 WL 1690669, *1 (E.D.N.Y. Apr. 26, 2016) (citation omitted). In order to obtain a temporary restraining order, the moving party must demonstrate: (1) a likelihood of success on the merits; (2) that absent an injunction the moving party is likely to suffer irreparable injury that cannot be remedied with monetary damages; (3) that the balance of hardships tips in favor of the moving party; and (4) that the public interest would not be disserved by the issuance of an injunction. *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010).

### IV. DISCUSSION

**A.     Success on the Merits**

The Lanham Act provides a right of action against "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol or device" that "is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1). There is a two-part test for analyzing trademark infringement claims under the Lanham Act. "The first prong looks to whether the senior user's mark is entitled to protection; the second to whether the junior user's use of its mark is likely to cause consumers confusion as to the origin or sponsorship of the junior user's goods." *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016).

In regard to the first prong, a certificate of registration with the PTO is "prima facie evidence that the mark is registered and valid (*i.e.*, protectable), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Id.* (quoting *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999)). Further, a registered mark becomes incontestable when the mark "has been in continuous use for five consecutive years subsequent to the date of . . . registration and is still in use in commerce." 15 U.S.C. § 1065. "An incontestable trademark 'shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce.'" *Dress for Success Worldwide v. Dress 4 Success*, 589 F. Supp. 2d 351, 358 (S.D.N.Y. 2008) (quoting 15 U.S.C. § 1115(b)). Here, Plaintiff registered the FLAX mark with the PTO, has continuously used the mark in connection with the sale of FLAX Goods for over twenty years, and has filed the necessary affidavit of continuous use with the PTO. *See* Dkt. No. 1-1 at 2-3; Dkt. No. 8-4 at ¶ 5; Dkt. No. 8-5 at 9. Therefore, Plaintiff's mark is entitled to protection.

The second prong in analyzing a trademark infringement claim "turns on whether ordinary consumers 'are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of [the junior user's] mark.'" *Gurthrie Healthcare Sys.*, 826 F.3d at 37 (alteration in original) (quoting *Playtex Prods., Inc. v. Ga.-Pac. Corp.*, 390 F.3d 158, 161 (2d Cir. 2004)). In analyzing the likelihood-of-confusion prong, courts generally consider a non-exhaustive list of eight factors originally set forth in *Polaroid Corporation v. Polarad Electronics Corporation*, 287 F.2d 492 (2d Cir. 1961): (1) the strength of the plaintiff's mark; (2) the similarity of the parties' marks; (3) the proximity of the parties' products in the marketplace; (4) the likelihood that the plaintiff will bridge the gap between the products; (5) actual confusion; (6) the defendant's intent in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the relevant consumer group. Each *Polaroid* factor "must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product." *Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 130 (2d Cir. 2004).

### *1. Strength of the Mark*

"The strength of a mark depends on two factors: inherent distinctiveness and acquired distinctiveness." *Giggle, Inc. v. netFocal, Inc.*, 865 F. Supp. 2d 625, 631 (S.D.N.Y. 2012). First, in *Abercrombie & Fitch Company v. Hunting World, Incorporated*, 537 F.2d 4, 9 (2d Cir. 1976), the Second Circuit established four different categories for assessing the inherent distinctiveness of marks. The four categories—from weakest to strongest—are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary and fanciful. *See id.* Here, Plaintiff concedes that the FLAX mark is not arbitrary and fanciful, and argues that it is instead suggestive and not descriptive. *See* Dkt. No. 8-1 at 6. "A descriptive mark '"tells something about a product, its qualities, ingredients or characteristics,"' while '[a] suggestive mark is one that "suggests the product, though it may take

6

imagination to grasp the nature of the product."'" *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 277 F. Supp. 2d 356, 362 (S.D.N.Y. 2003) (alteration in original) (quoting *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1509 (2d Cir. 1997)). The FLAX mark is descriptive because it tells us something about the characteristics of the product. In particular, it tells us that the clothing is linen, which is composed of fibers from the flax plant. Accordingly, the mark is not inherently distinctive.

Second, courts determine the acquired distinctiveness of a mark by considering the following non-exhaustive set of factors: (1) advertising expenditures; (2) sales success; (3) unsolicited media coverage of the product; (4) attempts to plagiarize the mark; (5) the length and exclusivity of the mark's use; and (6) consumer studies linking the name to the source. *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 500 (S.D.N.Y. 2013) (citing *Thompson Med. Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985)).

Plaintiff does not provide consumer studies or evidence of unsolicited media coverage. However, the other factors weigh in favor of finding that the FLAX mark has acquired distinctiveness. Plaintiff has invested more than $1 million per year in marketing FLAX Goods, which have grossed an average of $20 million per year in sales, and Plaintiff has exclusively used the FLAX mark since 1992. *See* Dkt. No. 8-4 at ¶¶ 5, 14, 17. Additionally, Plaintiff presents evidence that Defendant has attempted to plagiarize the mark by using several variations of a similar name—including Dr. Flax, Doctor Flax, and DoctorFlax—and selling clothing that is nearly identical to the FLAX Goods. *See* Dkt. No. 8-4 at ¶¶ 3, 21, 25. Although the Court finds that the FLAX mark is descriptive and not inherently distinctive, Plaintiff has provided sufficient evidence at this stage in the proceedings to show that the mark has acquired distinctiveness with the purchasing public. Therefore, the strength of the mark weighs in Plaintiff's favor.

### *2. Similarity of the Marks*

"When evaluating the similarity of marks, 'courts look to the overall impression created by the [marks] and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers.'" *Juicy Couture, Inc.*, 930 F. Supp. 2d at 500 (alteration in original) (quoting *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993)). There is an obvious similarity between the FLAX mark and the different variations of Dr. Flax, which simply add the title "doctor" before the word "flax." Despite the addition of the title "doctor," the dominant word remains "flax." "When the dominant words in two marks are the same, courts have found that their similarity can cause consumer confusion." *Lebewohl v. Heart Attack Grill LLC*, 890 F. Supp. 2d 278, 294 (S.D.N.Y. 2012) (collecting cases). This factor weighs in favor of finding potential confusion.

### *3. Proximity in the Marketplace*

The purpose of the proximity factor is to determine the degree to which the two products compete with each other. "The closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source." *Virgin Enter., Ltd. v. Nawab*, 335 F.3d 141, 150 (2d Cir. 2003). The competitive proximity inquiry focuses on two different elements: market proximity and geographic proximity. *See Brennan's, Inc.*, 360 F.3d at 134. "Market proximity asks whether the two products are in related areas of commerce and geographic proximity looks at the geographic separation of the products." *Id.* Here, there can be little doubt of market proximity—Plaintiff and Defendant both sell linen clothing marketed to women, and the design of the clothing is remarkably similar. As for geographic proximity, Plaintiff sells FLAX Goods throughout the

8

United States, and Defendant appears to be selling its goods to similar vendors. Accordingly, this factor favors a finding of confusion.

### *4. Likelihood that Plaintiff Will Bridge the Gap*

"The term 'bridging the gap' is used to describe the senior user's interest in preserving avenues of expansion and entering into related fields." *Juicy Couture, Inc.*, 930 F. Supp. 2d at 501 (quoting *NYC Triathlon LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 338 (S.D.N.Y. 2010)). But there is no gap to bridge in this case because Plaintiff and Defendant already operate in the same market of women's linen clothing. *See U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 531 (S.D.N.Y. 2011) ("Because the parties in this case are already competitively proximate, there is no gap to bridge and so this factor is irrelevant."). Therefore, this factor favors neither party.

### *5. Actual Confusion*

Actual confusion is the strongest evidence of the likelihood of confusion, but "[i]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 459 (2d Cir. 2004). Although plaintiffs typically show actual confusion through consumer surveys, "anecdotal evidence can sometimes still be used to show confusion, however it must be more than *de minimis*." *Medici Classics Prods., LLC v. Medici Grp., LLC*, 683 F. Supp. 2d 304, 312 (S.D.N.Y. 2010).

In this case, Plaintiff provides one example of actual confusion. Plaintiff was contacted by the licensee of the FLAX mark, who had spoken with the sales director of the Dallas regional trade show to inquire whether she was aware of the Dr. Flax brand. *See* Dkt. No. 8-4 at ¶ 28. The sales director "stated that she was aware of Dr. Flax and believed it was a subsidiary brand of

9

FLAX." *Id.* The fact that a sophisticated consumer with expertise in women's fashion was actually confused indicates a likelihood of confusion for the consuming public. But because Plaintiff provides just a single example, this factor weighs only slightly in Plaintiff's favor.

### *6. Defendant's Intent*

"The good-faith factor 'considers whether the defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and [on] any confusion between his and the senior user's product.'" *Savin Corp.*, 391 F.3d at 460 (2d Cir. 2004) (alterations in original) (quoting *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 575 (2d Cir. 1993)). "Prior knowledge of a senior user's mark is not, alone, conclusive evidence of bad faith." *GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D. P.C.*, 796 F. Supp. 2d 630, 646 (S.D.N.Y. 2011). But where a defendant's knowledge of a prior user's mark "is accompanied by similarities so strong that it seems plain that deliberate copying has occurred, the Second Circuit has upheld a finding of bad faith." *N.Y.C. Triathlon, LLC*, 704 F. Supp. at 339.

Plaintiff asserts that the FLAX mark "has achieved such widespread popularity with consumers of women's casual wear" that "it is simply not credible that [Defendant] was unaware of the FLAX Mark." Dkt. No. 8-1 at 14. The Court agrees that Defendant either knew or should have known of the FLAX brand when it entered the market for casual, linen clothing for women. Additionally, Plaintiff provides a series of photos comparing its clothing with Defendant's clothing; the photos are virtually identical. *See* Dkt. No. 8-4 at ¶¶ 21, 25. The models for Plaintiff's and Defendant's goods are wearing the same designs in the same colors and combinations. *See id.* At this stage in the litigation, Plaintiff has provided sufficient evidence to meet its burden of showing that Defendant adopted the Dr. Flax name in bad faith.

### *7. Quality of Defendant's Product*

"This factor is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Lebewohl*, 890 F. Supp. 2d at 296 (quoting *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 398 (2d Cir. 1995)). However, the difference in quality of the products is considered one of the less probative of the *Polaroid* factors. *N.Y.C. Triathlon, LLC*, 704 F. Supp. 2d at 340. In this case, Plaintiff does not make any assertion about the quality of Defendant's products. Therefore, this factor does not favor either party.

### 8. Sophistication of Consumers

"As the theory goes, the more sophisticated the purchaser, the less likely he or she will be confused by the presence of similar marks in the marketplace." *Savin Corp.*, 391 F.3d at 461. Courts have generally held that consumers of casual apparel are not particularly sophisticated. *E.g., Phillips–Van Heusen Corp. v. Calvin Clothing Co.*, 444 F. Supp. 2d 250, 257 (S.D.N.Y. 2006). However, Plaintiff claims that the majority of its sales are made at regional trade shows, where the purchasers are undoubtedly more sophisticated than the average clothing consumer. Because Plaintiff sells its goods to a mix of more and less sophisticated consumers, the Court finds that this factor is neutral.

### 9. Summary

After analyzing the *Polaroid* factors, the Court finds that Plaintiff has demonstrated a likelihood of confusion. The majority of the *Polaroid* factors favor Plaintiff, including the strength of the mark, the similarity of the marks, and their competitive proximity, which are considered the most three most probative of the *Polaroid* factors. *See Juicy Couture, Inc.*, 930 F. Supp. 2d at 503. Since Plaintiff has shown that the FLAX mark is entitled to protection and that there is a likelihood of confusion, Plaintiff has demonstrated a likelihood of success on the merits.

**B.     Irreparable Harm**

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). "To satisfy the irreparable harm requirement, [a plaintiff] must demonstrate that absent a preliminary injunction [it] will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quoting *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)). "Irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *U.S. Polo Ass'n, Inc.*, 800 F. Supp. 2d at 540. "[A]lthough a likelihood of confusion does not create a presumption of irreparable injury, a particularly strong likelihood of confusion should weigh in favor of finding irreparable injury." *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 335 (S.D.N.Y. 2011).

Plaintiff has invested over twenty years and many millions of dollars in the reputation of the FLAX mark. By misappropriating Plaintiff's trademark, Defendant has created a strong likelihood of confusion between the FLAX Goods and goods being sold under the Dr. Flax name. In the absence of injunctive relief, Plaintiff faces the loss of control of the reputation of its brand and the prospective loss of goodwill toward the FLAX mark. Therefore, the Court finds that Plaintiff has met its burden of establishing irreparable harm in the absence of an injunction.

**C.     The Balance of the Hardships**

Before issuing a preliminary injunction, "a court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor." *Salinger*, 607 F.3d at 80. In this case, the balance of the hardships does tip in Plaintiff's favor.

Plaintiff has been selling and promoting FLAX Goods since 1992, and it has invested approximately $3 to $4 million per year "in the goodwill of the FLAX Mark," including more than $1 million per year in marketing costs. Dkt. No. 8-4 at ¶ 14. Loss of control of the FLAX brand's reputation could undermine the goodwill that Plaintiff has been building for twenty-five years. It could also jeopardize Plaintiff's $20 million in annual sales, as well as Plaintiff's planned sale of the FLAX mark. Defendant, on the other hand, seems to have only recently established the Dr. Flax brand. Therefore, the brand has not accumulated the reputation and goodwill that the FLAX brand has gained over the years. Additionally, the temporary restraining order would not prevent Defendant from selling its goods; it would only prevent Defendant from selling them under the Dr. Flax name.

## D. The Public Interest

"Finally, the court must ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction." *Salinger*, 607 F.3d at 80 (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). Plaintiff has established the likelihood of confusion in this case, and the Second Circuit has long held that there is a "strong interest in preventing public confusion." *ProFitness Phys. Therapy Ctr. v. Pro–Fit Ortho. and Sports Phys. Thearapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002). Accordingly, the public interest would not be disserved by granting the temporary restraining order in this case.

## V. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion for a temporary restraining order is granted; and the Court further

**ORDERS** that the Temporary Restraining Order is granted without security; and the Court further

**ORDERS** that Defendant, its agents, employees, and representatives are temporarily enjoined from

(a) using any name or mark that is a colorable imitation of, a variation on, or is confusingly similar to Plaintiff's FLAX mark;

(b) using "Dr. Flax" or any variation thereon as a name, trademark name, domain name, or in any other manner in order to offer, distribute, sell, advertise, or promote its goods; and the Court further

**ORDERS** this Temporary Restraining Order shall remain in effect for twenty-eight days as the Court has found good cause exists to extend beyond the normal fourteen days, unless Defendant consents to an extension for a longer period of time; and the Court further

**ORDERS** that Defendant's response to Plaintiff's application for a preliminary injunction shall be filed within fourteen days of this Memorandum-Decision and Order; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: August 1, 2017
      Albany, New York

                                     Mae A. D'Agostino
                                     U.S. District Judge

14